The United States on Relation of Enroe v. Heritage Operators Group comes next for argument. Mr. Buehler. Good morning, panel. May it please the Court, my name is Terry Buehler. I'm here on behalf of Mr. Sam Enloe. He is the relator in this case. Mr. Enloe owns and operates a pharmacy that serves long-term care facilities like Heritage and Green Tree here. Green Tree being the pharmacy, Heritage being the long-term care facility, the nursing home. Mr. Enloe knows the law and he obeys the law. Heritage and Green Tree do not. A Schedule II drug, which is to say a narcotic, cannot be administered to a person by a nurse unless the pharmacist has received, reviewed, and approved the prescription that they got from a practitioner or doctor. What is the source of that legal rule? I'm sorry? What is the source of that legal rule? It is, I believe it's codified in 21 CFR 1306.11. The regulations you cite in your brief say that a prescription is a condition for narcotic drugs. Yes. They don't say that a pharmacist's sign-off is. Yeah, actually I think they do, Judge, because. So cite me a particular language that I should look at. 1306.11, requirement of prescription. There are two ways that a prescription drug can be administered to a patient. One is when a practitioner writes a prescription on a piece of paper, delivers it to the pharmacist. The pharmacist reviews it, approves it, which is to say looks at the patient's medical history and the drugs they're on, and then. No, look. Yes. I ask you to cite me a particular regulation. The regulation you've cited, which I looked at, says that a prescription is necessary. It says that a prescription is necessary. Yes. It does not say that a pharmacist must approve. Right? What you're arguing is that as a matter of federal law. Yes. A pharmacist can cancel a prescription for any narcotic drug and say I refuse to allow this to be given. Where does a pharmacist get that power in a statute or a regulation? Let me draw your attention to two pieces of the code that you were, one of which you were about to cite. Yes. And ask you if this answers Judge Easterbrook's question in your view or not. Yes. There's 21 CFR 1306.11A. Yes. Which says that the physician may send the prescription to the pharmacist electronically as long as the pharmacist receives, quote, original manually signed prescription for review prior to the actual dispensing of the Schedule II drug. So that's the first one I want you to respond to.  Okay? That's .11A. And then there's .11D that says, and now we're talking emergency situations, it says a pharmacy may dispense a Schedule II drug, quote, upon receiving oral authorization of a prescribing individual, end quote. So that's .11D. Right. Can you address those two sections? I do, Judge. I'm sorry. I didn't mean to interrupt you. Go ahead. Yes. If we'll go to the emergency situation, which is D, one, the pharmacist may dispense a controlled substance. Subsumed in that is that the drug has not yet been dispensed, delivered to the patient. You cannot take the pharmacist out of the equation if the pharmacist serves an important – You keep asserting that, but I would like you to quote the language on which that assertion is based. Well, I think I just did, Judge. It's in the case of an emergency situation as defined by the Secretary in 290.10 of this title, a pharmacist may dispense a controlled substance listed in Schedule II upon receiving oral authorization – I hope you see what my problem is, but I don't think you're seeing it. I don't, Judge. There are lots of regulations saying that a pharmacist may do X. Yes. The question is, is there a statute saying unless a pharmacist does X, the patient may not receive the drug? I think it does here, Judge. A grant of permission to do X differs from a rule only if the pharmacist signs off, may X happen. This is just a matter of logic. Let me ask it differently because this is critical. It says with this 11D, may dispense upon receiving. I hear you to be arguing upon receiving, may dispense upon receiving means the drug doesn't go out until the pharmacist has received. That's correct, Judge. Perhaps, Judge, Easterbrook is reading this to concentrate on the may dispense, may dispense upon receiving, meaning may is elective. Which is it in your view? Judge, I think that the pharmacist is a necessary and indispensable part of the program, and here's why. There are between 40 and 50 different Schedule II drugs that are routinely, commonly prescribed for pain. An emergency kit can only carry 10. So if the pharmacist gets an order for something that's not in the emergency kit, which is the only thing available, he cannot authorize, well, he will not authorize someone to take it out of the emergency kit and dispense it to the patient. It has to, in that instance, which is something that Green Tree and Heritage cannot do because they do not have a pharmacist on duty in the middle of the night, they cannot pull the drug, ask for it, and deliver it to the nursing home. More important, the drug may not even be consistent or compatible with the other drugs that the patient is already on. That is the pharmacist's job to review those and to conclude that this is an appropriate medication for this patient based on what they're already taking. And I think in... You're giving us really, I guess, the practical or the policy underpinnings of what this regime is. I'm asking you about the language in the federal regulations.  So now, let me go back to 11A where it says, Why doesn't prior to the actual dispensing mean the pharmacist has to get the prescription before the drug goes to the patient? Exactly right, Judge. That's what I thought I'd been trying to say in my inartful way. The necessary and indispensable role of the pharmacist is to review the prescription and authorize it being filled. What they argued to the lower court and argued in this court is no, in fact, as long as we leave a prescription on the voicemail, we can give the drug to the patient and the next day the pharmacist can review it. Well, at that point, the horse is out of the barn, so to speak. All of the safeguards built in with the pharmacist's review go down the drain if the drug is given before the pharmacist reviews it. And that is why when Mr. Enloe worked for Omnicare, they got caught doing it. They paid millions of dollars because the federal government also concluded that the pharmacist was an indispensable part of the chain before giving a serious narcotic drug, which, as everybody knows, opioids in this country are a huge problem, and this is one more way to monitor and regulate the use of opioids. So I would say to the court, you cannot dispense a drug in the middle of the night simply by leaving the prescription on the answering machine of the pharmacist who isn't going to even hear it until the next day. That's crazy. Because at that point, the patient has gotten the drug. It has done. Wait a minute, maybe it's not even strong enough. Then the patient lays in pain all night long because they didn't have an adequate medication in the emergency kit. The pharmacist is a necessary part of this, and if I didn't do a good enough job in my brief of explaining that, I apologize to the court. You cannot dispense Schedule II narcotics to a patient without the pharmacist reviewing and approving the drug before the patient gets it. After the patient gets it is really irrelevant. That only applies to non-emergency situations. I'm sorry? That only applies to non-emergency, right? Because there's a different provision with emergencies, where a prescription comes after the fact, right? I'm sorry, I didn't mean to interrupt. Yeah. The only material difference between emergency and non-emergency, in a non-emergency, the practitioner can give the prescription to the pharmacist in writing. In an emergency, it is permissible for the practitioner to give the pharmacist the prescription orally. But two things have to occur after that, Judge. One, the pharmacist has to write it down right then. And two, within seven days, the practitioner has to provide a copy to the pharmacist that basically replicates. And I would say to the court, the reason the paper, the non-emergency paper process exists and the phone is used in emergencies is because those were written before we had the electronic communication we have today. So, I think... So you're saying, in other words, emergency or non-emergency, in both situations, the practitioner is communicating with the pharmacist before the drug is dispensed. Right. Regardless of whether it's emergency or non-emergency. I would also suggest to the court that communication between doctor and pharmacist is implicit in 1306.11d.3, where it says, if the prescribing individual practitioner is not known to the pharmacist, he must make a reasonable effort to determine that the oral authorization came from the registered individual practitioner, which may include a callback. That also clearly suggests communication between doctor and pharmacist before the drug is dispensed. The only other thing I wanted to talk about today is Judge Seeger also dismissed the case because Mr. Enloe did not have access to any fraudulent bills. And clearly, if he had a fraudulent bill, we wouldn't have to have this discussion because that's very precise. Although, isn't the issue that your client is an outsider? Yes. In fact, a competitor. Right. Right? And so, in these cases where, you know, no invoice is required, it's... I think it's almost virtually always a person within the institution, for example, a nurse...  ...or an aide who sees things... Right. ...and can infer things, but actually can allege them. Well... Right? And so your client, wasn't that Judge Seeger's problem that your client could not actually allege specific instances? Well, let me tell you why I respectfully disagree with the court. Mr. Enloe gathered his information from two former employees of Green Tree and Heritage. In fact, one of the employees was the woman who wrote the policy directing nurses to violate the law. That's also in our complaint and our brief where it says you can't give a drug without a proper prescription. So, if you're calling after 530, leave this message on the answering machine, extension 1306, or whatever the heck it was, and then give them the drug. Well, that's contrary to my view of the law. I think it's contrary to law. But going back to where your Honor started, the precision that is necessary, I believe, to comport with 9B here, is that we have alleged an overarching fraud that would cover every drug, every Schedule II drug dispensed by Green Tree and Heritage off-hours because they are done pursuant to an illegal lack of a prescription, and they are immediately put into the billing system, so there is immediately a record of all of them. And I would say to the court that is enough precision to allege, essentially, a criminal conspiracy, which by its nature is kept secret by the participants. And no, my two employee sources were not in the billing department, but the one woman actually wrote the policy that we quote that directs the nurses to violate the law. I'm out of time, I guess. Oh, I guess I have 30 more seconds. I don't have anything else. Thank you, Counsel. Mr. Resigat. Good morning. May it please the Court. Counsel, my name is Michael Resis, and I am here today on behalf of the defendant of Pelley's, Heritage, and Green Tree Pharmacy. Plaintiff does not dispute that the second amendment complaint was subject to the heightened pleading standard required for fraud under Rule 9B. The district court properly concluded that the plaintiff failed to state a claim under the False Claims Act. Based on the heightened pleading standard, we respectfully ask you to affirm the district court. First, the emergency kit policy did not violate federal regulations governing emergency oral authorization. According to plaintiff, the emergency kit policy violates federal law by allowing nurses and practitioners to dispense drugs off hours based on a voicemail containing the oral authorization left by the practitioner. But the regulations allow drugs to be dispensed in an emergency. That's really why we're here today. As defined in Section 290.10, with the practitioner's oral authorization communicated to the pharmacist under 1306.11d, provided the practitioner follows up with a signed written prescription delivered to the pharmacist within seven days. What do you make of that upon receiving language in 11d, 1306.11d, which describes the emergency situation you're starting to talk about. Yes. And says that a pharmacist may dispense the drug upon receiving the oral authorization. So if it's the weekend, and the pharmacist is not there, and the doctor's leaving the voicemail so the nurse can go ahead and take the kit out and give it to the patient, how is the pharmacist dispensing the drug upon receiving the oral authorization, a.k.a. the voicemail? The voicemail is what he receives. But it says may dispense upon receiving. Can you help me with upon receiving? The prescription is orally communicated into the voicemail system of the pharmacy. That is all that is required in terms of receiving the oral authorization. I want to go back, though. I think just as Judge Jackson, you had referred during counsel's argument to 1306A. Yeah, but you were just talking about D now, so I'm on D now. Yes. And what I want to say is if you look at the first sentence of A, A creates an exception as provided in paragraph D of this section. So we should go from 1306A and confine our analysis to 1306D. The regulation is silent on how the pharmacist is to receive the emergency oral authorization and equally silent as to whether that has to take place in a live telephone call. I'm sorry. I want you to address the word upon receiving. What work is that phrase doing in that regulation? I really need your view on that. It's the pharmacy is receiving the authorization via the voicemail upon it being received into the voicemail system. That's when the pharmacist can dispense the drug. Yes. So in this scenario, how is the pharmacist dispensing the drug upon receiving if the nurse is giving it? Well, the emergency kit is considered an extension of pharmacy, and once the prescribing practitioner calls in the voicemail for the oral authorization, the nurse has the necessary authority to dispense the drug. And remember that apart from that, the practitioner has to follow up with a written prescription within seven days. Okay. Now that we've established that, which is very helpful to get your view on that, the district court allowed Mr. Enloe to submit some additional documents before it made its decision, and one of those was this letter from the DEA. Okay. Do you recall this? It was a letter from the DEA to the American Society of Consultant Pharmacists, and that's in the Record 67. It's a 2016 letter. And in this letter, DOJ says to the American Society of Consultant Pharmacists, controlled substances may not be dispensed from the kit for emergencies prior to receipt by the pharmacist of a valid prescription in accordance with the requirements of 21 CFR 1306.11 and 1306.21. So how does this language, controlled substances may not be dispensed from the kit for emergencies prior to receipt by the pharmacist of a valid prescription, explain to me your argument about how it supports your reading of the regulations and not Mr. Enloe's reading. Okay. So if I have the right letter remembered correctly, there is a reference to an oral prescription. And our position is that an oral prescription would include the authorization that the prescribing practitioner leaves on the voicemail off hours. And look, I understand, you know, what we're focusing on here today because it's very important. But to state a claim under the False Claims Act, a dispute over what a regulation requires is not sufficient to state a cause of action. Now, the plaintiff takes the position that the pharmacy has a necessary role in reviewing the circumstances in determining whether the prescription is appropriate even in an emergency situation. But if you look at 1306, it's the practitioner, not the pharmacist, who is evaluating the patient's medical condition, medical history, needs, assesses the risks and benefits of the drug, and prescribes and supervises its use. The regulations don't require or invite the pharmacist to second-guess whether the situation is an emergency or whether the drug and the amount prescribed are appropriate for the patient's needs. The regulations are written on the understanding that in an emergency, it's the doctor's duty to know what is to be prescribed, and it is the pharmacist's duty to give the patient what the doctor orders. Now, even assuming for the moment that plaintiffs' interpretation of the regulation were correct, even assuming that, it's not enough to allege that the conduct violated the regulations, and we've cited many Seventh Circuit cases that so hold at pages 19 and 20 of our brief. The plaintiff had to allege not only a violation of the federal law, but also that the defendants did so with actual knowledge, deliberate ignorance, or reckless disregard that the claims submitted to the federal government were false or fraudulent. Otherwise, every allegedly inaccurate claim would become a false claim, and the scienter requirement would be replaced by a strict liability standard. Plaintiff did not allege specific facts showing that Green Tree submitted false or fraudulent claims with the knowledge that emergency oral authorization prescriptions called into the voicemail system violated federal law. To show falsity, plaintiff referred to a May 2019 letter from the General Counsel for the Illinois Health Care Association. That letter is a mismatch for this case. It addresses an entirely different situation when it is the nurse who is calling in a pharmacy late at night on the practitioner's behalf to obtain the Schedule II drug. Green Tree's policy did not instruct nurses to directly contact the pharmacy, ever. Rather, it directed nurses to call the practitioner as 1306.11d requires, and the practitioner, in turn, calls in the emergency oral prescription via voicemail when no pharmacist is on duty. Plaintiff also referred to a couple of settlements between the DEA and pharmacies specializing in serving long-term care facilities like Heritage. These two settlements involved allegations nothing like the plaintiff's allegations here. As to the 2012 Omnicare settlement, the Schedule II drug was dispensed on nothing more than a nurse's request, that is, it lacked a valid written prescription and failed to comply with the emergency oral prescription. Nothing like this case at all. As to the 2015 PharAmerica settlement, the Schedule II drug was dispensed without calling the pharmacy or without a valid written prescription. Neither settlement involved a specific legal challenge to emergency oral prescriptions called in by practitioners to pharmacies via voicemail after hours when every other requirement under the regulations was satisfied. The May 2019 letter and the two settlements don't support plaintiff's claims under the False Claims Act. And further, unlike those two settlements, the federal government chose not to intervene in this case. Of course, it also chose not to dismiss this case. If you want an inference from the fact that the federal government didn't intervene, what inference should we draw from the fact that the federal government didn't dismiss the suit? All I'm saying is that in those cases, it's the federal government that is pursuing the pharmacy or the long-term care facility. That didn't happen here. That's all I'm saying. I leave it at that. I leave it at that. Plaintiff also failed to allege facts showing the materiality of their representation, that the federal government would have made a different decision about reimbursing Green Tree if it knew the practitioners were calling in emergency oral prescriptions via voicemail when the practitioner followed up with a required signed written prescription within seven days and all other requirements were met. Plaintiff did not plead facts that showed that the government conditioned payment of the claim on an interpretation of the regulation that required practitioners to speak with an on-duty pharmacist. Second, plaintiff did not support his allegation with specific representative examples to go to Judge Maldonado's point or question. Plaintiff never identified a heritage nurse, practitioner, or pharmacist involved in administering, prescribing, and dispensing a Schedule II drug, whether the emergency was a true emergency or whether it was a non-emergency or whether it was not a true emergency. Either way, plaintiff never provided the who, what, where, when, and how of the alleged scheme for any claim at the individualized transactional level. The District Court properly applied the particularity requirement of Rule 9b to the second amended complaint. For all the reasons set forth in our brief, we ask you to affirm if there are no further questions. Thank you, Counsel. Mr. Buehler, you have 32 seconds. I would just like to point out for the benefit of the Court that in April 2022, shortly after this complaint was unsealed, Green Tree hired an overnight pharmacist. They then, for the first time, had someone at night that they could call once they got notice of this lawsuit. That's all I have. Thank you. Thank you, Counsel. The case is taken under advisement.